IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUE ROSANNE TAYLOR,<br><br>  Plaintiff,<br><br>  v.<br><br>CITY OF OAKLAND, and DAVID LARSON,<br><br>  Defendants.<br>_____ / | No. C 06-05169 WHA<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

In this civil rights action, defendant City of Oakland moves for summary judgment on all of plaintiff's *Monell* claims. Triable issues of fact remain as to whether plaintiff's Fourth Amendment and substantive due-process rights were violated. In turn, defendant has failed to eliminate all triable issues of fact on plaintiff's custom or policy claim and failure to train claim. Plaintiff, however, has not shown a triable issue of fact regarding whether City officials ratified its employees' decisions or failed to discipline them. Accordingly, defendant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## STATEMENT

At the time of the events in question, plaintiff Sue Rosanne Taylor was 57 years old and was physically disabled because she was suffering from cancer. On April 5, 2004, she was involved in a minor, non-injury traffic accident at the intersection of 29th and Harrison Streets

1  in Oakland, California. Her car collided with a commercial van driven by Salim Zahraoui.
2  Officer Angela Coaston, who was later dispatched to the scene, concluded that the accident was
3  Taylor's fault (Rosen Decl. Exh. 1, 44:20–22). Plaintiff offered to exchange information with
4  Zahraoui (Chanin Decl. Exh. 2, ¶¶ 3–5). Zahraoui refused, and plaintiff testified at her
5  deposition that he was angry and yelling after the accident (Rosen Decl. Exh. 2, 30:4–16).

6  Thereafter, Taylor called Oakland police dispatch to report the accident. In these calls, Taylor identified herself to the dispatcher and gave her cell phone number (Chanin Decl. Exh. 3). Because the officers did not arrive on the scene for some time, Taylor became concerned for her safety. She testified in her deposition that Zahraoui was using foul language, refused to give her information, and attempted to solicit witnesses to support his version of events (Rosen Decl. Exh. 2, 34:12–35:5). She also testified that she felt unsafe because after the accident her car was parked in a red zone in an area on the street where she feared being rear ended (*id.* at 57:20–58:10). Despite this, Taylor testified that Zahraoui did not directly threaten her verbally or physically (*id.* at 58:20–59:10).

15 During one of the calls, Taylor spoke with dispatcher Drew Knight. She asked him whether she could leave the scene of the accident, and whether she would be violating any law if she did so (Chanin Decl. Exh. 2, ¶¶ 9–10, Exh. 3). Knight told her to use her judgment. He also told her that she should exchange information, but if the other driver was not willing, then she could make a report at a later time. The conversation with dispatcher Knight went as follows (*id.* at Exh. 3):

21  Taylor:    Alright, what damage do I do myself by getting my
               Triple A on the phone and getting out of here. I
22             took some photographs of the location of his car,
               of my car, of him because he refuses to identify
23             himself. I got a description of the man who picked
               up his courier materials. He wouldn't give me his
24             name because this man just came at us and shouted
               "Don't tell her anything." Um.
25
    Dispatch:  Well.
26
    Taylor:    Can you, can you advise me on that?
27
    Dispatch:  Ma'am, if you don't feel safe, you have to use your
28             judgment on that. If you don't feel safe then you

2

|   |   |
|---|---|
| | might want to leave, is, as uh you go with the information you have, but uh . . . |
| Taylor: | Okay, I don't violate any law by getting out of here, do I? |
| Dispatch: | Well, well you're supposed to exchange information. If under the circumstances, he's not willing to exchange information . . . |
| Taylor: | Uh, huh . . . |
| Dispatch: | . . . then if you leave you can always, always make a report at a later time. |
| Taylor: | Oh, I could come down to you and make the report, couldn't I? |
| Dispatch: | Yeah, yeah . . . police report is not required by law unless there is a crime or injury involved. |

\*          \*          \*

| | |
|---|---|
| Dispatch: | So, are you gonna wait, or what? |
| Taylor: | Well, I don't know. I'm going to determine whether I can move my car at all. I don't know that. |
| Dispatch: | Yeah, if you, if you leave, then you call us back, Okay? |
| Taylor: | Oh, I will do that, sure. |

Taylor made one more attempt to exchange information with Zahraoui. He told her not to talk to him, called her a "bitch" and said he did not want her information, nor would he give her his information (*id.* at Exh. 10, 55:1–13). She called dispatch back after she left the scene. She spoke to another dispatcher, Sunny Reese (*id.* at Exh. 3):

| | |
|---|---|
| Taylor: | Hi, I just spoke to an officer, I uh, was hit on Harrison Street, and I told him I felt very unsafe. Was gonna try to get the man to identify himself and he refused to and I have now left the scene. And he just asked me to call you back. |
| Dispatch: | You left the scene? |
| Taylor: | Yes, he told me it was alright. There was no injury. |
| Dispatch: | Okay, but you're gonna have to go to the Traffic Division to make a report then. We don't send officers out. |

3

| | | |
|---|---|---|
| 1 | Taylor: | Right. |
| 2 | Dispatch: | Ok, do you know where the police station is at? |
| 3, 4 | Taylor: | I do.  Yeah, now I'm gonna get home and address the damage to my car first.  So, is that alright with you? |
| 5, 6, 7 | Dispatch: | Yeah, that's fine.  I mean once you've left the scene you have to go to the Traffic Division.  I mean, it could be a week later, a month later — but, by law you don't have to have a report.  But um . . . |
| 8 | Taylor: | Well . . . well, I think we're going to want one. |
| 9, 10 | Dispatch: | Yeah, if your insurance requires it, you could go down the Traffic Division . . . and make a report in person. |

Regarding this call, Reese testified at her deposition that she believed that Taylor had spoken to a police officer, not a civilian police dispatcher (Rosen Decl. Exh. 3, 11:21–12:12).  Since she believed that a police officer had told Taylor that it was ok to leave the scene, she did not make a notation in her computer that plaintiff had called dispatch and had left the scene (*id.* at 50:9–20).  Regina Harris-Gilyard, Reese's supervisor at the time, testified that she should have made such a notation.  Harris-Gilyard later spoke to her about not making the notation, but did not discipline her (*id.* at Exh. 4, 14:21–16:2).

At the time of the incident, officers in the field could not access the CAD purge — which contained records of all calls made to dispatch — from their cars (*id.* at 11:22–18:7).  They could, however, later access the CAD purge because it was printed out each day.  Personnel at the communications center, such as operators, dispatchers, and their supervisors, could access the computer information by entering in an incident number (*id.* at Exh. 5, 20:20–23:21).  Even if Reese had made the notation in the computer that Taylor had left the scene, officers in the field would not have had access to that information.  Other dispatchers, however, could have seen the notation as soon as the entry was made.

After Taylor left, Officer Angela Coaston arrived on the scene of the accident.  Zahraoui was still there.  A witness on the scene told her that Zahraoui had been angry, yelling, and using foul language while Taylor was there (*id.* at Exh. 1, 33:15–34:6).  Zahraoui gave Coaston his

4

1  license, registration, and insurance information (*id*. at 23:25–24:25).  Coaston determined that
2  Taylor had not left such information at the scene of the accident before she left.  She got
3  Taylor's license plate number from Zahraoui and asked the dispatcher to run the license
4  number.  Thereafter, either Coaston or defendant Sergeant Larson advised over the radio that
5  Taylor had left the scene of the accident without exchanging information (*id*. at 27:4–10;
6  32:20–33:3).

7  Officer Murray Hoyle heard the report and spotted plaintiff's car on Broadway Terrace
8  in Oakland.  While he drove behind her, he noticed that her registration was not current.  He
9  pulled her over into the driveway of her home (Hoyle Decl. ¶¶ 2–4).  Hoyle asked plaintiff for
10 her license, registration, and proof of insurance.  She told him that she did not have insurance
11 and that her registration had lapsed.  She also told him that she had called the dispatcher who
12 had told her that she could leave the scene.  After this, Taylor asked if she could go into her
13 house to call the dispatcher to verify her version of the events, but he refused to let her (Rosen
14 Decl. Exh. 2, 83:20–85:22; 93:16–94:25).  In his testimony at Taylor's criminal trial, Hoyle
15 testified that he was not paying much attention to what Taylor was saying and that he did not
16 hear her say that she had obtained permission to leave the scene of the accident (Chanin Decl.
17 Exh. 17, 22:25–28; 26:1–25).  Later in his declaration, Hoyle stated that he feared that he
18 somehow could not continue his investigation if she went into the house (Hoyle Decl. ¶ 7).

19 Taylor also testified in her deposition that Hoyle first confronted her regarding the
20 accident, stating that she was the hit-and-run suspect.  He blocked her path in the driveway
21 while she was speaking to him.  He asked for her license, and she retrieved it from her purse
22 which was still in the car.  Plaintiff testified that he told her to place her wallet on the trunk of
23 the car.  When she dropped her shoulder and made a small gesture, according to plaintiff, Hoyle
24 wrenched her wrist over her head, shoved her up the driveway and over the roof of his police
25 car (Chanin Decl. Exh. 10, 95:1–97:23).  She testified that he then placed a handcuff tightly on
26 her right wrist (*id*. at 100:19–101:18).

27 Hoyle declares that he told plaintiff that she was being detained for her expired
28 registration, lack of insurance, and suspected involvement in a hit-and-run accident.  He

5

believed that she was resisting arrest at the time, so he responded by applying a compliance hold. At the time, Taylor was approximately 5'9" tall and weighed approximately 200 pounds. Hoyle also reports that it ultimately took the combined efforts of another officer, Officer Odom, to subdue plaintiff sufficiently to place her in handcuffs (Hoyle Decl. ¶¶ 6–10). At the time, Taylor was suffering from cancer (and still is) and it will be up to the jury to decide if she was as fit as alleged.

Plaintiff testified in her deposition that Officer Odom told her to get into Officer Hoyle's police vehicle. She asked them for help because she could not lower herself into the car without using her hands. Eventually, the officers got her into the car, and while she was sitting in the car, she yelled for help (*id.* at 106:2–109:25).

Officer Coaston heard over the radio that Taylor had been detained and asked Zahraoui to follow her to the location on Broadway Terrace so he could identify plaintiff. Sergeant Larson had arrived before Officer Coaston and told her to wait before writing up a hit and run report (Rosen Decl. Exh. 1, 59:28–25; 73:1–11). Officer Hoyle also declares that Larson told him that there might be a problem with the hit-and-run charge (Hoyle Decl. ¶ 12). Larson arrested plaintiff under California Penal Code § 148, for resisting arrest, and she was later booked on charges under California Vehicle Code § 4000(a) and § 16028(a), for having expired registration and driving without insurance.

Taylor was taken to the hospital after she was arrested, complaining of pain in her back, arm, and sides. At the hospital, her arm was placed in a removable cast, and she was transported to the Oakland city jail. She remained there until she was released on bail early the next morning. The Oakland district attorney subsequently charged plaintiff for leaving the scene of an accident, but she was eventually tried only for resisting arrest. About two years later, on May 24, 2006, the Alameda Superior Court granted Taylor's motion for acquittal after the close of evidence in her trial. The entirety of the action was resolved in her favor.

\*      \*      \*

Defendant presents considerable evidence regarding training procedures at the Oakland Police Department. As to the handling of Taylor's calls to police dispatch, Knight testified that

the City of Oakland had trained him to tell motorists that they had discretion to leave the scene of an accident if they felt unsafe (Chanin Decl. Exh. 11, 43:13–48:22). His supervisor, William Valladon, testified in a deposition that Knight followed procedure in responding to Taylor's call. Valladon did not know of any disciplinary actions or remedial training that took place because of this incident (*id*. at Exh. 12, 58:1–6; 65:11–66:1).

Complaint operators, who handle 911 calls to Oakland's communications center, attend a 40-week training academy and receive regular on-the-job training and evaluations. The City of Oakland also has telephone communications guidelines, procedures, and responsibilities (Rosen Decl. Exhs. 7, 8). The procedures tell complaint operators that if a caller believes himself or herself to be in a dangerous situation, the operator should advise the caller to use his or her judgment in deciding whether or not to leave. Operators should not tell callers to remain in dangerous situations.

The City of Oakland also has in place policies regarding the use of physical force. General Order K-3 permits the use of reasonable force under some circumstances. Officers are to select options from a continuum of force, mandating that officers will not employ a more forceful measure unless it is judged necessary under the circumstances, or a lower level of force was attempted and was unsuccessful (Downing Decl. Exh. 1. 1–3). Defendant also has in place a system for reporting and investigating the use of less-than-lethal force, as set out in General Order K-4 (*id*. at Exh. 2). The order requires periodic reports on the use of force, sets out procedures for investigating incidents in which force was used, and discipline and training for officers. The City also has an Early Intervention System in place to identify and correct conduct and performance problems by officers. Investigations and inquiries under this system can be triggered by complaints, resisting arrest claims, and large numbers of incidents in certain categories (*id*. at Exh. 9).

\*          \*          \*

This action was filed on August 24, 2006. Plaintiff alleged claims under 42 U.S.C. 1983 against both defendant Larson and defendant City of Oakland. On July 19, 2007, plaintiff filed a motion to have averments deemed admissions and for partial summary judgment against

7

1 defendant Larson. An order dated September 7, 2007, denied in part and granted in part the
2 motion to have averments deemed admissions and denied the motion for partial summary
3 judgment. Defendant's motion for summary judgment was filed on September 11, 2007. Trial
4 in this action is set for December 3, 2007.

**ANALYSIS**

Summary judgment should be granted where the pleadings, discovery, and affidavits show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004). Once the moving party has met its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

Municipalities and local governments can be sued directly for violations of constitutional rights under 42 U.S.C. 1983 where government officials were acting pursuant to an official policy or recognized custom. *Monell v. Dept. of Social Serv. of New York*, 436 U.S. 658, 690 (1978). To directly sue a municipality under 42 U.S.C. 1983, a plaintiff must show that (1) he or she had a constitutional right of which he or she was deprived; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Oviatt v. Pierce*, 954 F.2d 1470, 1474 (9th Cir. 1992). Here, Taylor argues that the City of Oakland had a policy under which dispatchers told callers that they could leave the scene of an accident. This was done even though there was no way of alerting officers in the field that a caller had been told it was ok to leave the scene of an accident. Officers were not required to

ask dispatchers if this had occurred before issuing a hit-and-run broadcast. Plaintiff argues that this policy was the motivating force in depriving her of her constitutional rights.

### 1. UNDERLYING VIOLATION OF PLAINTIFF'S CONSTITUTIONAL RIGHTS.

Taylor must first show that there was a violation of her constitutional rights. *Oviatt*, 954 F.2d at 1474. *First*, she argues that Officer Hoyle's arrest violated her Fourth Amendment rights. *Second*, she argues that Officer Hoyle used excessive force against her. *Third*, she argues that she was maliciously prosecuted. *Finally*, she argues that her substantive due-process rights were violated under a state-created danger theory.

#### A. Unreasonable Seizure.

Plaintiff claims that Officer Hoyle had no probable cause to arrest her. Probable cause requires a fair probability or substantial chance of criminal activity, as determined by the totality of the circumstances known to the officers at the time. *United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2002). Defendant presents evidence that Officer Hoyle noticed that plaintiff's registration was expired before pulling her over. He had heard the radio bulletin saying that she had left the scene of an accident, but also saw her expired registration. The expired registration alone, according to defendant, gave Hoyle probable cause to arrest her.

Taylor does not dispute that her car's registration was expired or that she was driving without insurance. She contends instead that under California law, Officer Hoyle should have at most given her a written citation. Plaintiff cites *People v. Medina*, 110 Cal. App. 4th 171, 176 (2003), for the proposition that drivers stopped for a traffic violation should only receive a written notice to appear, or citation; they should not be physically detained unless there are specific and articulable facts indicating their involvement in another crime. The *Medina* decision also cites California Vehicle Code § 40500, which states "[w]henever a person is arrested for any violation of this code not declared to be a felony . . . the arresting officer shall prepare in triplicate a written notice to appear in court . . . ." Both driving with an expired license and driving without proof of insurance fall under that code section. Defendant did not present evidence that Taylor refused to give her name or identifying information. At least under

9

1  California law, Hoyle should have issued her a citation for driving without insurance and an
2  expired registration.

3  Police officers may not place a person under custodial arrest when they only have
4  probable cause to cite them for an infraction. *Edgerly v. City and County of San Francisco*, 495
5  F.3d 645, 653–54 (9th Cir. July 17, 2007). Here, however, Taylor argues that Hoyle actually
6  pulled her over with the intention of arresting her for leaving the scene of the accident. Taylor
7  testified that, to the extent Hoyle asked her questions before placing her under arrest, they were
8  about leaving the scene of the accident, not about her expired registration. Plaintiff also
9  testified that she called dispatch and was given permission to leave the scene of the accident.
10 Viewing the facts in the light most favorable to plaintiff, a reasonable trier of fact could
11 conclude that Hoyle did not have probable cause to arrest her.

### B. Excessive Force.

13 "Determining whether the force used to effect a particular seizure is reasonable under
14 the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on
15 the individual's Fourth Amendment interests against the countervailing governmental interests
16 at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations and quotations
17 omitted). Determining whether the force used was reasonable "requires careful attention to the
18 facts and circumstances of each particular case, including the severity of the crime at issue,
19 whether the suspect poses an immediate threat to the safety of the officers or others, and
20 whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid*. "The
21 reasonableness of a particular use of force must be judged from the perspective of a reasonable
22 officer on the scene, rather than with the 20/20 vision of hindsight . . . ." *Id*. at 396–97. "In
23 some cases . . . the availability of alternative methods of capturing or subduing a suspect may be
24 a factor to consider." *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994).

25 Taylor also argues that Hoyle used excessive force by wrenching her arm over her head,
26 pushing her down on the car, and applying handcuffs too tightly. Defendant presents Officer
27 Hoyle's declaration, in which he stated that at the time he believed that Taylor had no intention
28 of going into her house to call the dispatcher to clear up the situation. Hoyle purportedly could

10

1  not follow her into her house, so he detained her at her car.  Plaintiff disagrees, and testified at
2  her deposition that Hoyle was agitated and aggressive when speaking to her.  She also testified
3  that he attacked her when she dropped her shoulder and made a small gesture.  Viewing the
4  facts in the light most favorable to Taylor, a reasonable jury could find that Hoyle used
5  excessive force.

6  To maintain a *Monell* claim, however, plaintiff must show that a City custom or policy
7  was the moving force behind her injuries.  *Monell v. Dept. of Social Serv. of New York*, 436
8  U.S. 658, 690 (1978).  Plaintiff's claim for excessive force fails (against Oakland) because she
9  has not shown how Hoyle's alleged use of excessive force could have been caused by a City of
10 Oakland custom or policy.  As this order explains below, Taylor argues that her injuries were
11 caused by the City of Oakland's policy of telling callers that they could leave the scene of the
12 accident without alerting officers in the field that the caller had been given permission to leave.
13 Plaintiff has presented no evidence that Hoyle's use of excessive force was caused by the
14 policy.  A reasonable jury could conclude that Hoyle arrested Taylor because he did not know
15 that she had already called dispatch, but there is no evidence that it was the "moving force"
16 behind his alleged use of excessive force.  Indeed, plaintiff never argues that defendant's
17 policies and procedures on the use of force are inadequate.  Accordingly, plaintiffs' excessive
18 force claim cannot form the basis of her *Monell* claim.  Defendants' motion for summary
19 judgment is **GRANTED** as to Taylor's *Monell* claim based on excessive force.

20       **B.   Malicious Prosecution.**

21 Next, Taylor argues that she was subjected to malicious prosecution because she
22 complained about Hoyle's use of excessive force.  To prevail on a claim for malicious
23 prosecution, plaintiff must show that the defendant caused her to be prosecuted with malice and
24 without probable cause, and that he did so for the purpose of denying the plaintiff a specific
25 constitutional right.  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004).

26 In opposing defendant's motion, plaintiff repeats a number of the arguments she made in
27 support of her motion for partial summary judgment against defendant Larson.  Specifically, she
28 argues that she was prosecuted with the intention of depriving her rights under the First

11

1    Amendment. To show this, plaintiff must show that her protected speech was a motivating
2    factor in defendant's wrongful conduct. *Id*. at 1071. A First Amendment malicious prosecution
3    claim must be based on something more than a speculative chilling of speech based on
4    legitimate and generalized law enforcement initiatives. A showing of specific, targeted police
5    surveillance and action intended to suppress protected speech is sufficient. *Mendocino*
6    *Environmental Ctr. v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994).

7    Plaintiff argues that her rights were violated because Larson knew that she had
8    complained about Hoyle's conduct and that she was injured during the incident. Plaintiff does
9    not clarify to which "complaint" she referred, though she did testify that she protested while
10   being arrested and while Hoyle allegedly used excessive force against her. Plaintiff also
11   presents evidence that Larson told Hoyle at the time of her arrest that there was a problem with
12   arresting her on the hit-and-run charge. Viewing the facts in the light most favorable to
13   plaintiff, in his report, Larson misrepresented that Taylor was not given permission to leave the
14   scene of the accident, and recommended that she be prosecuted for leaving the scene of an
15   accident. Accordingly, defendant has not eliminated all triable issues of fact regarding
16   plaintiff's malicious prosecution claim under 42 U.S.C. 1983.

17   **C.   Substantive Due Process.**

18   "[T]he Due Process Clause is violated by executive action only when it can properly be
19   characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis v. County*
20   *of Sacramento*, 523 U.S. 833, 847 (1998). The Supreme Court has "spoken of the cognizable
21   level of executive abuse of power as that which shocks the conscience." *Id*. at 846. It is clear
22   that mere negligence or liability grounded in tort does not meet the standard for a substantive
23   due process violation. *Id*. at 849.

24   Plaintiff argues that her substantive due process rights were violated under the
25   state-created danger doctrine. In general, the government is not liable for the actions of third
26   parties. *DeShaney v. Winnebago Co. Dept. of Social Servs.*, 489 U.S. 189,195–96 (1989). One
27   exception is the state-created danger doctrine, in which the government can be liable where its
28   affirmative conduct a party in danger from a third party that he or she otherwise would not have

12

1   been in. *Morgan v. Gonzales*, 495 F.3d 1084, 1092–93 (9th Cir. July 26, 2007).  A plaintiff
2   must show that government officials "acted with deliberate indifference to a known or obvious
3   danger." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).
4         Taylor argues that police dispatchers, by telling her that she was free to leave the scene
5   of the accident and failing to inform police on patrol that they did so, placed her in danger from
6   Officer Hoyle.  The state-created danger doctrine itself seems to indicate that it applies to
7   dangers from third parties.  *See, e.g., Wood v. Ostrander*, 879 F.2d 853 (9th Cir. 1989) (holding
8   that there was a triable issue of fact where police impounded a woman's car stranding her in a
9   high crime area where she was subsequently raped).  The question becomes whether the third
10  party could be another government officer, for instance, where the government's action or
11  inaction places a person in harm's way from other government actors, here, causing them to be
12  unlawfully arrested or prosecuted.  The closest precedent seems to be decisions such as
13  *Lombardi v. Whitman*, 485 F.3d 73, 80–81 (2d Cir. Apr. 19, 2007), in which the Second Circuit
14  noted that a state-created danger claim could arise when government officials gave a plaintiff a
15  false sense of security from a known, specified danger.  This decision seems similar to the facts
16  at hand.  Because Taylor believed she had permission to leave the scene of the accident, she did
17  so, which placed her at risk of being arrested at her home by Officer Hoyle and later prosecuted.
18        Defendant also presents evidence, which plaintiff does not dispute, that dispatcher
19  Reese's failure to make the notation was merely an accident.  Even if she had made the
20  notation, however, officers in the field may not have known about it given that they had no
21  access to the information and no obligation to verify if a driver had called dispatch.  Viewing
22  the facts in the light most favorable to plaintiff, a reasonable trier of fact could find that the
23  policy itself constituted deliberate indifference to the risk that plaintiff would be wrongfully
24  arrested.  Accordingly, subject to yet more briefing on this issue at trial, there remain triable
25  issues of fact as to plaintiff's state-created danger claim, and summary judgment is not
26  appropriate.

### 2. CUSTOM OR POLICY AS MOVING FORCE.

Municipalities and local governments can be sued directly for violations of constitutional rights under 42 U.S.C. 1983 where government officials were acting pursuant to an official policy or recognized custom. *Monell v. Dept. of Social Serv. of New York*, 436 U.S. 658, 690 (1978). The plaintiff must identify the policy or custom which caused the violation. "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the conduct alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

### A. Custom or Policy.

A custom is a widespread practice that, although not authorized by law or express city policy, it is so permanent and well-settled that it applies with the force of law. *Monell*, 436 U.S. at 690–91. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

Taylor argues that the City had a custom under which they would train dispatchers to tell people that they could leave the scene of an accident if they felt unsafe. Dispatchers were supposed to make a notation in the computer system if a person called in saying that they had left the scene, but the notation was only available to other dispatchers. Officers could have found out about the notation, but there was no obligation for them to call dispatch to see if a driver suspected of leaving the scene of an accident had called in before arresting them. This policy was a disaster waiting to happen, or so it was argued. It was foreseeable that a caller would leave the scene of an accident believing that they had permission to do so. The officers in the field would then not know the caller had called in, and the caller would be arrested for leaving the scene of an accident.

Defendant presents evidence that the City's actual policy stated that dispatchers could not tell callers to stay in dangerous situations. Dispatchers should have told callers to use their judgment in deciding whether or not to leave. Plaintiff testified that she was told that she could leave. Additionally, viewing the facts in the light most favorable to plaintiff, the call with dispatcher Reese would seem to indicate that Reese approved of her decision to leave. Even assuming callers were merely told to use their judgment, it is reasonable to think that at least some callers would conclude that they could leave. It was also foreseeable that callers would do so.

Defendants concede that at the time of this incident, officers in the field did not have access to the information entered into the system by dispatchers. Under this system, an officer in the field would not have known if a driver had called in unless the dispatcher had first alerted him or her to that fact, or the officer had asked the dispatcher. Plaintiffs present evidence that there was no policy in place that would have required an officer to make any such verification before arresting someone suspected of leaving the scene of an accident. The officer assigned to the call may have learned about the notation from the dispatcher, but any other officer who might have encountered a suspect, such as Hoyle, may not have known after the original hit-and-run broadcast had gone out. Accordingly, there still remains a triable issue of fact as to whether this policy was the moving force behind plaintiff's alleged unlawful arrest and malicious prosecution. As described above, however, the dispatch policy could not have been the motivating force behind Hoyle's alleged use of excessive force, so defendants' motion for summary judgment is **GRANTED** as to that theory. Defendants' motion for summary judgment is **DENIED** as to plaintiff's claims based on unlawful arrest, malicious prosecution, and substantive due procees.

### B. Failure to Train.

"[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Assuming plaintiff has shown that the training received by employees was inadequate, the question then

15

1   becomes whether inadequate training can be justifiably called municipal policy. *Id*. at 389–90.
2   To show failure to train, a plaintiff must show that "(1) he was deprived of a constitutional
3   right; (2) the City had a training policy that amounts to deliberate indifference to the
4   constitutional rights of the persons with whom its police officers are likely to come into contact;
5   and (3) his constitutional injury would have been avoided had the City properly trained those
6   officers." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. May 8, 2007).

7   Taylor presents two theories on her failure to train claim. *First*, she argues that
8   defendant failed to train its employees to verify that a driver had not called in before leaving the
9   scene of an accident before making an arrest. This operates in the same manner as plaintiffs'
10  custom or policy claim. *Second*, she argues that the City failed to train dispatcher Reese to
11  make a notation that Taylor had called dispatch and had left the scene. Neither party disputes
12  that Reese failed to make such a notation, or that she was not disciplined for failing to do so.
13  Defendants present evidence that Reese thought that Taylor had been given permission to leave
14  the scene of the accident by an officer. But viewing the facts in the light most favorable to
15  Taylor, a reasonable trier of fact could still conclude that a failure of training caused Reese not
16  to make the notation.

17  As to deliberate indifference, the City argues that it could not have anticipated these
18  particular facts or trained its employees for them. In response, plaintiff contends that the City
19  acted with deliberate indifference to the confusion that could result when officers in the field do
20  not know whether a driver has actually left the scene of an accident or not. If the officers did
21  not know, then they could, as here, run the risk of unlawfully arresting someone. Accordingly,
22  there still remain triable issues of fact in plaintiff's failure to train claim. Defendants' motion
23  for summary judgment is **DENIED** as to this claim.

### C.     Ratification and Lack of Remedial Action.

25  Under a ratification theory, a plaintiff must show that "authorized policymakers
26  approve[d] a subordinate's decision and the basis for it." *City of St. Louis v. Prapotnick*, 485
27  U.S. 112, 127 (1988). To demonstrate ratification, plaintiff must show that the decisionmaker,
28  here the Chief of Police, made "a deliberate choice from among various alternatives to follow a

16

1 particular course of action." *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992). "A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act." *Christie v. Iopa*, 176 F.3d 1232, 1239 (9th Cir. 1999).

With this theory, it is difficult to discern whom defendant should have disciplined and for what they should have been disciplined. Plaintiff in her opposition states "the City has not disciplined any officer or dispatcher, has not taken any other remedial action and has ratified the unlawful conduct" (Opp. at 24). The City agrees that it did not take any remedial action. Both sides also agree that the City undertook an investigation after plaintiff filed suit, but the investigation was closed because final action rested in the hands of the Chief of Police. There is also no evidence that the City was aware of the incident until plaintiff filed this action.

At all events, defendant argues that plaintiff has presented no evidence that the City made a conscious choice approving of the actions of either the dispatcher or the officers involved and the basis for their actions. The mere fact that there was an investigation that was later closed is not sufficient. The Ninth Circuit has noted that "to hold cities liable under Section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into Section 1983." *Weisbuch v. County of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997). Here, plaintiff has presented no facts that would indicate that city officials acted with deliberate indifference to her rights. Accordingly, there remain no triable issues of fact regarding plaintiff's *Monell* claims under a ratification theory. Defendant City of Oakland's motion for summary judgment is **GRANTED** as to plaintiff's ratification claim.

## CONCLUSION

For all of the above-stated reasons, defendant the City of Oakland's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

Dated: October 23, 2007.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

17